UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

W.G. AND M.G. INDIVIDUALLY, AND
ON BEHALF OF K.G.,

        Plaintiffs,

   -v-

THE NEW YORK CITY DEPARTMENT
OF EDUCATION,

        Defendant.

-------------------------------------------------------x

No.  10 Civ. 4099 (LTS)(KNF)

## OPINION AND ORDER

APPEARANCES:

LAWRENCE D. WEINBERG, ESQ.
35 Underhill Ave 1-I
Brooklyn, NY 11238

*Counsel for Plaintiffs*

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
   By: Abigail Lynne Goldenberg
      Assistant Corporation Counsel
   By: Jaime Beth Orloff
      Special Assistant Corporation Counsel
100 Church Street
New York, NY 10007

*Counsel for Defendant*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE:

Plaintiffs W.G. and M.G. bring this action, individually and on behalf of their minor son, K.G. (collectively, "Plaintiffs"), against the New York City Department of Education ("Defendant" or "DOE"), pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("the IDEA"). Plaintiffs' application for reimbursement for tuition paid for their unilateral out-of-state placement of K.G. at Cross Creek Academy, LLC, a residential therapeutic school in Utah ("Cross Creek"), was denied by their local Committee on Special Education ("CSE"). They sought due process review of that decision pursuant to the IDEA and New York State law; on October 27, 2009, the Impartial Hearing Officer ("IHO") who conducted the "impartial due process hearing" found that K.G. was eligible for special education programs and services as a student with an emotional disturbance, and ordered the school district to reimburse Plaintiffs. The DOE petitioned for further administrative review of the IHO's decision and, on January 21, 2010, the State Review Officer ("SRO") reversed the IHO's decision, finding that K.G. did not meet any of the criteria for eligibility as a student with an emotional disturbance under the IDEA, and was therefore ineligible to receive the special education programs and services provided for by the statute. Plaintiffs were thus denied reimbursement for their costs incurred in connection with the placement of K.G. at Cross Creek.

Plaintiffs' complaint before this Court seeks review and reversal of the SRO determination. See 20 U.S.C.A. § 1415(i)(2)(A)-(C) (West 2010). Defendant moves for summary judgment, seeking dismissal of Plaintiffs' complaint. Plaintiffs cross-move for summary judgment, seeking full reimbursement for the tuition costs they incurred, plus attorney's fees and the costs incurred in bringing this action. The principal disputed issues are

whether K.G. qualified as a student with an emotional disturbance under the IDEA, whether the Cross Creek program was an appropriate unilateral placement by Plaintiffs, and whether the equities favor reimbursement. The Court has jurisdiction of this action pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331.

The Court has reviewed thoroughly all of the parties' submissions, including the entire administrative record. For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiffs' motion is denied.

## I. STATUTORY AND PROCEDURAL FRAMEWORK

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their needs . . . [and] to ensure that the rights of children with disabilities and the parents of such children are protected." 20 U.S.C.A. §1400 (d)(1)(A)-(B) (West 2010). "Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA, 20 U.S.C. § 1400(d)(1)(A)). Section 1401 of the statute defines "child with a disability" to mean

> a child –
> (i) with intellectual disabilities, hearing impairments. . ., speech or language impairments, visual impairments . . ., serious emotional disturbance (referred to in [the statute] as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C.A. § 1401(3) (West 2010). Department of Education regulations (and substantially identical regulations adopted by the New York State Education Department in connection with

the implementation of the federal statute) define "emotional disturbance" as

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
>> (A) An inability to learn that cannot be explained by intellectual, sensory or health factors.
>> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>> (C) Inappropriate types of behavior or feelings under normal circumstances.
>> (D) A general pervasive mood of unhappiness or depression.
>> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i) (2010). See also N.Y. Comp. Codes & Regs. tit. 8, § 200.1. The regulation goes on to provide that the term emotional disturbance "does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section." 34 C.F.R. § 300.8(c)(4)(ii) (2010).

The relevant state or local educational agency must conduct an individualized evaluation to determine whether a child is one with a disability, and develop an annual written "individualized education program" ("IEP") for each child with a disability. 20 U.S.C.A. § 1414(d) (West 2010). The evaluation process can be initiated by the agency or the child's parent, cannot be commenced without parental consent, and is subject to statutory temporal and procedural requirements. 20 U.S.C.A. § 1414(a)(1) (West 2010). In New York, IEPs are developed by local "Committees on Special Education" ("CSEs") in conjunction with the disabled student's parents. N.Y. Educ. L. § 4402(1)(b)(1).

The IDEA requires that parents be provided with an opportunity to present a complaint regarding the identification, evaluation, or placement of their child through the IEP

process.  20 U.S.C.A. § 1415(b)(6)(A) (West 2010).  Parents who are dissatisfied with a school

district's disability status determination, or IEP, may unilaterally place their child in a private

school, at their own risk, and then seek a retroactive tuition reimbursement from the local school

district.  20 U.S.C.A. § 1412(a)(10)(C) (West 2010).

        If the parents believe that the school district has not responded appropriately to

their complaints, the IDEA grants them the right to pursue their grievances through an "impartial

due process hearing" before an IHO.  20 U.S.C.A. § 1415(f)(1)(A) (West 2010); N.Y. Educ. L.

§ 4404(1)(a).  The IHO's decision may be appealed by either party to an SRO, who

independently reviews the findings and the decision rendered by the IHO.  20 U.S.C.A.

§ 1415(g) (West 2010); N.Y. Educ. L. § 4404(2).  The SRO's decision may in turn be challenged

in federal district court, which is empowered to "receive the records of the administrative

proceedings," to "hear additional evidence," and to "grant such relief as the court determines is

appropriate" based on "the preponderance of evidence" before it.  20 U.S.C.A. § 1415(i)(2)(C)

(West 2010); N.Y. Educ. L. § 4404(3); see also Forest Grove School Dist. v. T.A., 129 S. Ct.

2484, 2492 (2009) (the IDEA "gives courts broad authority to grant 'appropriate' relief,"

including reimbursing the parents when appropriate).

## II.  THE FACTUAL RECORD

        The following section summarizes the pertinent aspects of the voluminous factual

record, including relevant undisputed facts.  K.G. was born on May 17, 1991.  In the 2007-08

and 2008-09 academic years he was sixteen and seventeen years old and in the eleventh and

twelfth grades.  (Tr. at 465.[1])

---

[1]     "Tr." refers to the transcript of the IHO hearings conducted on May 27, June 24, and
July 7, 2009.

A.  Manifestations of Academic and Behavioral Problems

K.G. began having serious academic problems in the tenth grade while attending St. Edmund's Preparatory School, a private school.  (Id.; IHO Hr'g Ex. CC-1.[2])  K.G. worked just hard enough so that he could play on the sports team, and was suspended "a few times" for exhibiting disruptive behavior, until he eventually failed several classes and was expelled from the school.  (SRO Dec. at 2;[3] Tr. at 466-67.)  K.G.'s parents enrolled him in James Madison High School ("Madison"), a New York City public high school, for the 2007 summer session, which he completed successfully, and he continued there as an eleventh-grader in the fall of 2007.  (Tr. at 466-67.)  According to K.G.'s mother, M.G., K.G. "cooperated" in the initial weeks of the fall semester but, when K.G.'s class schedule was changed by Madison a few weeks into the fall 2007 session, his emotional state deteriorated, he did not want to attend school any longer, and he would escape through the school's back door after M.G. drove him to school and watched him enter the building.  (Id. 472-74.)

B.  Private Therapeutic Intervention; Communications with DOE

Beginning in approximately October 2007, K.G.'s parents had him evaluated by a psychiatrist and treated by a psychologist.  Although there is no contemporaneous documentation of the initial consultation or diagnosis in the administrative record, the psychiatrist, Irene Gurvits M.D., represented in a letter written in March 2009 (after the CSE's denial of disability status to K.G.), that she had diagnosed K.G. between October 2007 and

---

[2]     Exhibits entered into the record at the IHO hearings by K.G.'s parents were designated with letters; those entered into the record by Defendant were designated with numbers.

[3]     "SRO Dec." refers to the January 21, 2010, administrative decision of State Review Officer Paul F. Kelly.

March 2008 as "MDD 296.33 r/o Bipolar Disorder Depressed 296.53, GAD 300.02 PSA 304.80"

and "ASPDO 301.70."[4]   (IHO Hr'g Ex. S-1.)  Her brief narrative description of him in that letter

was as follows: "[K.G.] is a 10th grade HS drop out with h/o[5] multiple arrests for assaults with

bodily injury, Polysubstance abuse and dependence, neurovegetative Sx[6] consistent with

depression, anxiety and serious personality disorder.  He has been unresponsive and defiant to

multiple interventions and redirections by parents, family members, school counselors, therapist,

this writer and law enforcement. . . . Due to serious Mood Disorder and Violent behavior and its

implications, . . . K[.G.] was heading for a parental bypass.  Due to that the only option for

[K.G.] was a Lock-down therapeutic school with continuous 24/7 observation to prevent harm to

himself or others."  (Id.)  An undated Social History apparently taken by Dr. Gurvits notes that

K.G. was referred by "parents + lawyer" because of depression, anxiety, agitation, poor

academic achievement, behavior problem, "refusal to attend school violent B/R,[7] destroying

property indictment by grand jury for 2 assault charges for inflicting bodily injury to another

teenager."  (IHO Hr'g Ex. R-3.)  The notes further indicate that K.G. had a history of outpatient

treatment at 10-11 years of age because of "explosive B/R mood swings for 1yr/wkly," that he

was treated with therapy with negative outcome, "then refused to attend."  A history of drinking

---

[4]     According to the American Psychiatric Association's Diagnostic and Statistical
        Manual of Mental Disorders, Fourth Edition Text Revision (Washington, DC, 2000)
        ("DSM-IV"), these abbreviations and numerical references signify the following
        conditions: Major Depressive Disorder, recurring and severe, ruled out Bipolar
        Disorder Depressed; Generalized Anxiety Disorder; Polysubstance Dependence; and
        Antisocial Personality Disorder.

[5]     The Court interprets "h/o" as an abbreviation for history of.

[6]     The Court interprets "Sx" as an abbreviation for symptoms.

[7]     The Court interprets this abbreviation as referring to behavior.

in excess of 20 beers on weekends, with alcohol abuse since the age of 12 was also noted.  (Id. at R-6.)  Also indicated are a negative experience with school, and that he was an unhappy, poor student who "refuses to attend school, refuses home schooling."  (Id. at R-11.)  He is further noted to get along "selectively" with others but not with his parents, and to socialize with friends and a "GF"[8] of six months.  According to the history, K.G. was in no program and "refuses adamantly to attend school, refuses home schooling, when not working just hangs out," and "has very poor I/J[9] and impulse control . . . listens to music & smokes . . . MJ; parents have no control over him."  (Id. at R-12.)

K.G.'s mother indicated that she made a number of efforts to draw K.G.'s truancy issues and major depression diagnosis to the attention of Madison guidance officials in the fall of 2007, including making specific requests to change his schedule, but she was rebuffed and told that it was her job to get him to school.  (Tr. at 472-74.)  According to M.G., K.G. dropped out of school in November 2007, "isolated himself" from his family, discussed the "futility of life," "self-medicated" with marijuana and "seemed not to care about himself or anyone else."  (Id. at 489-92.)

In the winter of 2007 to 2008, with the assistance of an advocate and the help of outside agencies including "Help Your Teen" and "Family in Crisis," the parents investigated alternative placements for K.G., including a program for "Troubled Teens" at Cross Creek.  (Id. at 496-97, 500-03.)

In a report of a March 19, 2008, evaluation, psychologist Robert Meyers reported

---

[8]        The Court interprets "GF" to mean girlfriend.

[9]        The Court interprets "I/J" to refer to insight and judgment.

the results of administration of a personal assessment inventory (PAI), a sentence completion test, a clinical interview and a review of records. (IHO Hr'g Ex. AA-1.) Dr. Meyers stated that K.G. admitted "to multiple arrests, assaults, felonies and [that he has] dropped out of 11th grade. He has no job, and is involved in drug usage on a part time basis." (Id.) Dr. Meyers' written report presented the following conclusions:

> [K.G.'s] responses during the current evaluation indicate an adolescent who is experiencing a great deal of difficulty complying with the everyday demands of life. He tends to be negative and oppositional with regard to authority figures, and intrusive, manipulative and assaultive with regard to peers. However, with young or impaired children, he can be protective and caring. [K.G.] lacks adequate impulse control and is frequently careless and indifferent with regard to the consequences of his actions. [K.G.] tends to project the blame onto others, however, he will admit to inappropriate behavior, sometimes showing remorse.

> [K.G.] seeks attention in a negative fashion. An underlying need for nurturance has become confused with hostility and a great deal of anger is near the surface, only to come out when impulses escape. He is very alert and sensitive to nuances interpersonally. In some ways, he is hyper alert and can utilize this defensively in meeting his own needs. At times, he can lose perspective and his emotions can easily overwhelm him.

> Interpersonally, [K.G.] has many serious emotional problems. His self-concept is regressed, infantile, dependent, passive, and ineffectual, with underlying impulsive and aggressive elements. He views his environment and those in it as unsatisfying and potentially dangerous and threatening. His ego defenses are unable to contain his impulses. His thinking deteriorates, judgment becomes poor, and he is unable to maintain impulse control. Generally, his thinking becomes bizarre under stress, but there is the potential for [K.G.] to become explosive. He clearly can be a threat to himself and others because of the amount of inner conflict, bizarre thought processes and poor impulse control.

> Current meds: Zoloft
> Buspare
> Axis I Oppositional Defiant Disorder[10]

---

10     The DSM-IV "multiaxial classification" system of assessment consists of five axes: Axis I - clinical disorders and other conditions that may be a focus of clinical

. . .

> [K.G.'s] recurrent pattern of negativistic, defiant, disobedient, and hostile
> behavior toward peers and authority figures falls within the scope of
> Oppositional/Defiant Disorder. His frequent loss of temper, arguments and
> assaults, defiance, blame on others, resentfulness and spitefulness typically causes
> clinical [sic] significant impairment in his social, academic and occupational
> functioning.

(IHO Hr'g Ex. AA-2 to AA-3.)  The report makes no reference to any diagnosis of depression.

C.  Unilateral Cross Creek Placement; Request for Services Under IDEA

   According to Plaintiffs, after consulting with K.G.'s private therapist and

psychologist, they determined that he required a residential placement and chose Cross Creek, a

"residential treatment center" with a "therapeutic component."  (SRO Dec. at 3; Tr. at 395.)

They then sent two letters to school and DOE personnel, each dated March 20, 2008.  In a letter

to "Cheryl Knobel, or current chairperson" they stated: "Our son [K.G.], born May 17, 1991

attended James Madison High School and is not attending school. [K.G.'s] student ID is

[omitted].  I am requesting that CSA provide a Free Appropriate Public Education for my son.  I

believe my son requires special education services."  (IHO Hr'g Ex. 1.)  In a letter of the same

date addressed to "Ms. Selter, Guidance," the parents wrote: "We believe [K.G.] needs Special

Education with residential placement, for his disability.  We know that process can take time so

we are placing him in Cross Creek School for Boys until the Department Of Education can find

appropriate placement."  (IHO Hr'g Ex. F-1.)  A DOE "Notice of Referral" treating the parents'

letter as a referral for a determination regarding K.G.'s educational needs and special educational

services, and containing information about the determination process and the need for parental

--------

   attention; Axis II - Personality disorders and mental retardation; Axis III - general
   medical conditions; Axis IV - Psychosocial and environmental problems; and Axis V
   - global assessment of functioning ("GAF").  (DSM-IV at 27.)

consent, was prepared, dated March 28, 2008. (IHO Hr'g Ex. G-1.)  On April 3, 2008, through

private arrangements made by the Plaintiff parents, K.G. was "forcibly taken" by two retired

police officers to Cross Creek.  (Tr. at 475-77.)  At the time K.G. was taken to Cross Creek, an

appearance in court in connection with an assault charge was looming.  (Id. at 508-15.)

       The IHO hearing record and the parties' subsequent submissions reflect that,

between April 7 and May 29, 2008, the school district staff and the parents attempted to contact

each other to discuss the status of the K.G.'s evaluation.  The DOE's file on K.G.'s evaluation

request was apparently closed and then reopened during this time period after M.G. followed up

on the March 20th request.

       An April 26, 2008, intake evaluation report by Cross Creek therapist Ludmil

Manov, M.D., a psychiatrist,[11] reported that [K.G.] had previously been diagnosed with

depression and had been on the medications Sertraline and Busprion "since August."  According

to the report, [K.G.] said that "he has chosen to come to the program in order not to go to jail

where he had been detained 3 times for 24 hours."  History information provided by K.G. and

M.G. indicated that K.G. had been doing well until the 10th grade, when he had a conflict with

his hockey coach and became "depressed, irritable and isolative."  K.G. related that he had used

marijuana ("pot") daily for the preceding two years and drank excessively on weekends, and that

he was experiencing anxiety about separation from his girlfriend.  As to "social history," Dr.

Manov related that "[K.G.] has always done well in school . . [,] has multiple friends and denies

any gang involvement."  He is reported to have "quit going to school as he was very anxious and

irritable about his legal charges."  Dr. Manov characterized K.G. as "a friendly and cooperative

_____

[11]    Dr. Manov testified at the IHO hearing that he is licensed as a child psychiatrist in the
state of Utah and holds an M.D. degree.

young man with good eye contact . . . [who] described his mood as I'm doing well but I don't

like it here . . . His insight and judgment is good as he is willing to change however this is

discrepant with the report from his therapist who describes him as manipulative and dishonest."

Summing up, Dr. Manov described K.G. as having

> [S]uffered with mild to moderate depressive symptoms due to conflict with his
> hockey coach and quitting his involvement in hockey.  This culminated in legal
> charges filed and also giving up on his school however he has never been suicidal
> and has been able to enjoy social activities.  [K.G.] reported that he has calmed
> down and is feeling much better after coming to the program.  He has been on
> Zoloft and Busprion since August 2007 with good response.  It is of note that he
> doesn't express remorse for charges of assault and fights where he hurt people
> however he wants to change and quite these behaviors.

(IHO Hr'g Ex. T-3.)

Dr. Manov diagnosed K.G. as follows: "Diagnosis AXIS I: Major Depressive

Disorder, single episode and currently in full remission.  Anxiety disorder, NOS, Conduct

Disorder Adolescent Onset.  AXIS II: Deferred.  AXIS III: No diagnosis.  AXIS IV: Dropped out

of school and legal charges for assault currently out on probation.  AXIS V: Global assessment

functioning is currently 65."  The medication was continued, with an increase in the anti-anxiety

medication, and work "with his therapist on his contract behavior," as well as a three-month

follow up, was also directed.  (Id.)  On May 16, 2008, Plaintiffs sent Dr. Meyers' March 2008

evaluation report to the CSE chairperson, and the school district sent a letter to the parents on

May 20, 2008, informing them of a June 10, 2008, appointment for the completion of consent

documentation, a social history and psychological and educational evaluations of K.G.  (Tr. at

66-68; IHO Hr'g Ex. 4.)  By letter dated June 2, 2008, Plaintiffs responded that K.G. could not

be brought from Cross Creek because he was a "flight risk," and that, according to K.G.'s

psychologist and psychiatrist, bringing him back would "interfere [with] and disrupt" his Cross

Creek program and schooling. (IHO Hr'g Ex. 3.) Plaintiffs did not appear on June 10, 2008, for the scheduled meeting and, by letter dated July 8, 2008, Defendant informed K.G.'s parents that a new meeting had been scheduled for July 15, 2008, to complete K.G.'s social history. (IHO Hr'g Ex. 5.) Plaintiffs participated in the July 15, 2008, meeting, but the district social worker determined that Dr. Meyer's March 2008 report was incomplete because it did not include cognitive or academic achievement testing. (SRO Dec. at 5; Tr. at 87-88, 182-83.) Recognizing that K.G. could not easily be brought back from Cross Creek, Defendant authorized Plaintiffs to obtain an independent evaluation of K.G. in Utah at the district's expense. (SRO Dec. at 5.)

Because Kenneth Seely, the independent psychologist Plaintiffs chose to conduct the evaluation, had a waiting list, K.G. was not evaluated until October 8, 2008. (SRO Dec. at 5.) Dr. Seely's 17-page report of his October 8, 2008, evaluation of K.G., which Plaintiffs claim they provided to the district in November 2008 and Defendant acknowledges receiving in December 2008, details findings based upon the administration of numerous assessment tools, written information from a teacher and from K.G.'s mother, and an interview. The stated purpose of the valuation was "to assess [K.G.'s] current level of psychological and intellectual functioning and to address any treatment and/or placement recommendations." (IHO Hr'g Ex. Z-1) Seely's report summary indicates that K.G. "appeared open and honest during the interview, often elaborating on questions and offering other information that helped to illustrate what he felt were his problems. Overall, it appeared that he gave a good effort and testing is a good representation of his current functioning." (Id. Z-2.) In the interview, K.G. acknowledged alcohol abuse from the sixth grade and use of marijuana from the ninth grade, as well as fighting, and said the "the courts let him plea to completion at a program to have all of his charges dropped." (Id. Z-3 to Z-4.) K.G. "denied any problems with peers, but had conflicts with

teachers because he felt they had favorite students." (Id. Z-4.)

On the basis of testing, Dr. Seely found that K.G.'s general cognitive ability is in the average range of intellectual functioning. (Id. Z-6.) The "Depression Inventory" assessment "indicated a non-clinical level of depressive symptoms." (Id. Z-10.) Dr. Seely's "Conclusions and Recommendations" included the following:

> The evaluation suggests that [K.G.] is a 17-year-old male who is currently functioning in the "average" range of intellectual functioning. . . . [His difficulties with particular intellectual skills as indicated by the testing] are not at the level of a learning disorder, but are likely to contribute to more difficulties in school and frustration in the learning process. This may contribute to testing findings that he has developed a negative attitude toward academic achievement, and is prone to significant behavioral/academic problems in the school setting. This is further supported by [K.G.'s] statements that he enjoys the classes he does well in. [K.G.'s] attitude about school appears to be a primary detractor to him being able to perform at expected levels in school because he "hates" school, and doesn't feel he does well; even though he sees himself as an average to above average student. [K.G.] appears to have blamed many of his problems in school on teachers and the authoritative system of school, which included his mother hearing about his exploits and feeling that teachers favored students other than himself. . . . Although many of these difficulties may be a result of his struggles with academic material, [K.G.] is capable of average levels of work if he provides a concerted and concentrated effort in school. This level of motivation and participation does not appear likely due to his oppositional and behavioral difficulties that were reported from an early age. Therefore his academic difficulties are compounded by his behavioral difficulties. . . . He continues to have oppositional difficulties that will interfere with his level of motivation, although a consistent environment of behavior structure is reported to have helped him in applying himself in school. This environment will be necessary until he can work through other behavioral difficulties and can take more personal responsibility for himself and his schoolwork. . . .
>
> [K.G.'s] testing indicated that his difficulties are focused on behavioral acting out and oppositional attitudes and chemical abuse, with some developing personality traits. Mother implied that past difficulties with depressive difficulties were a major component of his need for treatment, but these were not seen as prevalent in his current testing. . . . Testing indicated that his main difficulties are a disregard for social standards and problems in acting-out and impulsivity. Testing further stated that he is more likely to have difficulties with defiance, disobedience and truancy, and is likely to have a history of legal violations and

court actions. . . . [K.G.'s mother] also endorsed many oppositional behaviors at home, and [K.G.] admitted that he often yelled and screamed at his parents, particularly when school related topics came up. He felt that his parents "needed control" and testing indicated that he is more likely to be resentful of authority figures and have attitudes and behaviors related to conduct disorder. . . . These difficulties meet criteria for a Conduct Disorder, and he will require a restrictive behavioral environment to challenge his ideals and beliefs about his behaviors. . . . [K.G.] currently worries about being placed in prison and consequences that could result from this, but he will need to get beyond a mere fear of punishment and see how prosocial behaviors will help him and his life. Testing suggested that he continues to have hostile and aggressive impulses, and behavioral interventions can help to show him how his oppositional behaviors and ideals create problems. However, individual and group therapy will need to challenge his continued thoughts and acceptance of his aggressive lifestyle. . . .

(Id. Z14- Z-15.)

[K.G.] has been in treatment for several months, but he appears to still maintain many of his previous thoughts and ideals. This may be partly due to the formation of a personality style that includes a self-absorbed concern for strength and power. Testing indicated that he will tend to be egocentric, narcissistic, selfish and self-indulgent, and has strong needs for affiliation, social status and recognition. . . . These symptoms suggest the development of Narcissistic Personality traits, which are likely to further his oppositional ideals and acceptance of his acting out behaviors. . . . These narcissistic attitudes are likely to be counterproductive to his behavioral interventions, and will need to be addressed in his individual therapy.

(Id. Z-15.)

[K.G.'s] other difficulty is his reported use and abuse of chemicals. . . . Drug and alcohol abuse is common with his behavioral profile . . . . He is given the diagnoses of Cannabis Dependence and Alcohol Abuse. He will require substance abuse interventions and involvement in 12 step programs to learn more about his addictions.

(Id. Z-16.)

Dr. Seely recommended that the then-current "interventions in the form of a

residential treatment can help [K.G.] change his use of acting out as his means of coping with his

life problems . . . [but] it appears that these interventions are complied with but are not helping

him to change his attitudes and ideals regarding his oppositional and antisocial behaviors." (Id.)

Individual, group and family therapy are recommended to, among other things "gain an

understanding of his acceptance of oppositional and conduct disordered behaviors and his

Narcissistic personality traits," to "work more on his relationship with his parents," and "to work

on understanding how others feel, and understanding that his behaviors are not normal or

expected." (Id.)  Dr. Seely further observed that "[K.G.] will need to be engaged in a significant

regime of substance abuse interventions and attendance at 12-step meetings for his addiction."

(Id. Z-16 to Z-17.)

> Dr. Seely's "Diagnostic Impression - DSM IV" findings were as follows:

| Axis I: . . . | Conduct Disorder, Childhood Onset, Moderate |
| | Cannabis Dependence |
| | Alcohol Abuse |
| Axis II: | Narcissistic Personality traits |
| Axis III: | Deferred |
| Axis IV: | Problems related to drug abuse, social environment, familial, and relational problems |
| Axis V: | Current GAF 55. |

(Id. Z-17.)

D.  CSE Evaluation and Determination

> After further communication between K.G.'s parents and the school district, the

CSE convened a meeting to evaluate K.G. on February 10, 2009.  Attendees included a bilingual

school psychologist who also participated as a district representative, a district social worker, a

district special education teacher, an additional parent member, K.G.'s parents, the parents'

advocate; and by telephone, Cross Creek's academic director, K.G.'s Cross Creek therapist, and

another teacher from Cross Creek who worked as a regular education teacher for K.G.  (SRO

Dec. at 8.)  Following a review of K.G.'s records, and after hearing from the participants, the

CSE determined that K.G. was not entitled to special educational services, and recommended that he return to the general education program.  (Id.; see also IHO Hr'g Exs. 11, 12-1 to 12-3.) The CSE's handwritten "Contact Sheet" notes of its February 10, 2009, meeting summarized its determination as follows:

> Eligibility for special services discussed to determine whether he fits disability criteria – reviewed 13 classifications.  Recent psychol. testing indicated no evidence of learning Disability.  Therefore the only remaining classif that could possibly be considered is E.D., however he did not meet the DOE criteria for E.D. [K.G.'s] problems stem from his history of substance abuse and maladjusted behavior and the classific. does not apply to students who are socially maladjusted.  Parents brought up that [K.G.] had a Dx of depression.  The team noted that the depression coincided with his substance abuse and that the depression may be secondary to the substance abuse.  Prior to the substance abuse, [K.G.] was doing well in school, had friends, good relationship with teachers and peers and there was no indication of depression.  The psychol. report indicated a non-clinical level of depressive symptoms.  Therefore he is not eligible for spec. educ. services.  Other DOE-affiliated acad. progs for students with substance abuse were discussed.

(IHO Hr'g Ex. 12-3 to 12-2.[12])

E.  IHO Request and Hearing

By letter dated February 10, 2009, K.G.'s parents informed the school district of their disagreement with the CSE's conclusions, that they believed K.G. should have been classified as IDEA-eligible and that they believed he required residential treatment, and informed the district that they would maintain his placement at Cross creek and "seek reimbursement for this residential program at the public's expense."  (IHO Hr'g Ex. 13.)  On February 26, 2009, Plaintiffs initiated a formal request for an Impartial Hearing, asserting that K.G. should have been classified as a child with emotional disturbance and that he required a "structured, therapeutic residential program in order to meet his unique special education needs

---

[12]      The pages of this exhibit appear to have been numbered in reverse order.

and receive meaningful education benefit," and seeking findings of various procedural and substantive flaws in the CSE proceeding, and reimbursement for Cross Creek tuition costs for the period from April 3, 2008 to June 30, 2009,[13] as well as costs and fees.  (IHO Hr'g Ex. A-1 to A-5.)  Evidentiary hearings were held before the IHO on May 17, 2009, June 24, 2009, and July 7, 2009.  K.G. graduated from Cross Creek with a high school diploma in April of 2009.

At the IHO hearing, Plaintiffs argued that K.G. was emotionally disturbed because he exhibited three of the characteristics of emotional disturbance that are identified in 34 C.F.R. § 300.8(c)(4) (2010) and N.Y. Comp. Codes & Regs. tit. 8, § 200.1, specifically an inability to build or maintain satisfactory interrelationships with peers and teachers; inappropriate types of behavior or feelings under normal circumstances; and a generally pervasive mood of unhappiness or depression.

The DOE presented testimony from Helene Potash, a Special Education Evaluation Program Placement Officer who had previously served for many years as a social worker in schools, and Katina Altema, a bilingual Department of Education school psychologist. (Tr. at 59-60, 128-30.)  Ms. Potash identified herself as the person responsible for the day to day management of the CSE function, including "managing and supervising the clinical and clerical staff," reviewed CSE's records concerning the timing of pertinent events in the K.G. matter, and testified concerning certain of the CSE and IEP-related procedures.  (Id. at 60-104.)

Ms. Altema testified that she is school psychologist for the CSE, and in that capacity performs psycho-educational evaluations, classroom observations and consultations with parents.  She chairs CSE reviews, also acts as District Representative in connection with

---

[13]     It appears that K.G.'s Cross Creek placement terminated prior to the end of the 2008-09 academic year.  W.G. testified at the IHO hearing that K.G. had been at Cross Creek for a total of 13 months.  (Tr. at 519-22.)

such reviews, and develops IEPs, among other duties.  She testified that she is qualified to

interpret the results of cognitive and achievement testing, as well as psycho-social evaluations.

(Id. at 130-31.)  She explained that a "District Representative is someone that chairs the CSE

review, that has a knowledge of the disability classifications under the IDEA, and is aware of

resources or – that the District has to offer these students who have a disability classification."

(Id. at 132.)  She participated in K.G.'s review as District Representative and as the school

psychologist.  (Id. at 133-34.)  Ms. Altema explained the basis of the CSE's classification of

K.G. as non-disabled and its recommendation of a general education program for him as follows:

> After reviewing his records, consulting with his parents, as well as school
> personnel at the review, it was felt that [K.G.] did not fit into one of the disability
> classifications.  We had the psych educational evaluation that indicated that
> [K.G.] had average intellectual ability, and that if he applied himself he would
> present grade appropriate work.  We had the transcript that demonstrated that he
> had A's and B's and that he was actually nearing completion of graduating high
> school. . . . The classroom teacher indicated that he was doing well in school
> academically and socially.
>
> We had an extensive psycho educational evaluation that was done on the outside,
> that indicated that [K.G.'s] level of depression was not clinical, that it was not
> relevant at the time. [K.G.] denied having feelings of depression.  [K.G.] did not
> feel that medication was actually helpful.  The psychologist mentioned that
> [K.G.'s] behavior problems seemed to stem from his disregard for social
> standards and with his use of chemical abuse, his being impulsive, and under the
> IDEA students who are socially maladjusted or have a history of substance abuse,
> that does not qualify for the disability classification of emotional disturbance.

(Id. at 138-39.)  In response to a request to define "social maladjustment," Ms. Altema testified:

> Social maladjustment is a condition where one would violate the social norms and
> the social norms that are established.  So they are students who experience
> difficulty - - they have difficulties with truancy, substance abuse, they can be
> frustrated, manipulative, and they defy authority.
>
> . . . And usually students who are - - have a diagnosis of oppositional defiant
> disorder or conduct disorder usually have some type of social maladjustment.

(Id. at 140.)  With respect to the rationale for the finding of non-disability, she added:

> One of the therapist's notes had indicated that – that [K.G.'s] major depressive –
> this depression was actually before admission [to Cross Creek], that his episode
> of depression was actually just one single episode and that it was mild and that it
> was in remission, that he did not – his feelings of depression were not prevalent at
> the time.  Actually his mood was actually stabilized.  He was well behaved.  And
> in the therapist's notes, it mentioned that [K.G.] – was going to be considered to
> be – off medication, psychotropic medication.  And at the time of the CSE
> review, it was noted that [K.G.] was off medication for actually two months and
> he was actually doing pretty well academically and socially without the meds.  So
> it was very successful.

(Id. at 141.)

Ms. Altema testified that the CSE considered all thirteen possible disability

classifications with the parents, and that "the two that we felt might have been appropriate for

[K.G.] were, one, learning disability, and the second would be emotional disturbance."  (Id. at

142.)  The psychologist's evaluation did not indicate that K.G. fit the learning disability criteria.

(Id. at 142-43.)  Ms. Altema summarized the five criteria for emotional disturbance as follows:

> One is an inability to learn that cannot be explained by intellectual, sensory, or
> health factors.  Another would be inability to maintain satisfactory interpersonal
> relationships with peers or adults.  A third one would be having a general mood of
> unhappiness or depression.  A fourth one would be inappropriate types of
> behaviors under normal circumstances.  And the fifth one is develop – physical
> symptoms or fears relating to school or personal problems.
>
> . . .
>
> They just need to have one of the criteria, and it just had – but it has to be there
> for a marked degree of time and for a long period of time, and it has to also
> adversely impact upon their overall educational performance.

(Id. at 144.)  She testified that K.G. failed to meet the first criterion

> Because he demonstrated average intellectual potential.  He was actually
> performing well in school.  That wasn't an area of concern.  The teacher reported

good academic performance.  The transcripts indicated A's and B's, and he was near completion of his high school credits.  So that did not fit.

(Id. at 145.)  The second criterion was considered inapplicable because

> Basically, the school report and notes that we had – the school indicated that [K.G.] was actually performing well in school, that he actually was able to listen in class.  He was able to follow the class rules and the routines.  He was actually considered to be a mentor.  He was involved in peer mentoring.  He was part of the leadership team.  And they – his level of progress was considered to be at the upper level.  So, and I believe that is one of the highest levels that the school has for kids in that program.  So he was actually performing very well.  He related well with his peers and adults.  So he didn't fit this criteria at all.

(Id. at 146.)  As to the third criterion,

> The team felt that – the CSE team felt that [K.G.] did not meet this criteria.  Mom felt that because he had a past history of depression, he should qualify for this criteria.  But at the time of the review it was felt that he didn't fit the criteria for having depression, or a pervasive mood of unhappiness.  We had the pyscho educational evaluation that indicated that [K.G.'s] level of depression was actually non-clinical.  It wasn't prevalent at the time of testing.  [K.G.] indicated to the psychologist that he didn't have depression in the past, that he – that medication was actually [sic] helpful.  The psychologist mentioned that [K.G.'s] behaviors actually stemmed from his use of chemical-substance abuse.  And actually stemmed from his disregard for social standards.
>
> And according to the IDEA, students who are socially maladjusted, or have a history of depression, cannot be considered for the ED classification.  In addition, we had the therapist's notes that indicated that his major depressive disorder was actually a single episode.  It was mild and it was in full remission.  He was considered to be well behaved.  There was a contingent plan to weed [sic] him off psychotropic medication.  And by the time of the CSE review meeting, he was actually two months successfully off medication and he was doing well academically and socially.  So this is why we felt that he did not fit the criteria for having a marked degree or period of time for depression.

(Id. at 146-47.)  With respect to the fourth (inappropriate behaviors) criterion, the CSE

concluded that "[t]here was nothing in his history or in his current functioning that indicated that

he had inappropriate types of behaviors under normal circumstances. . . . That did not seem

relevant to him." (Id. at 148.)  Finally, there was no history of fears or physical symptoms

indicative of qualification for the fifth criterion.  (Id.)  The CSE examined the depression

criterion most extensively of the five.  (Id. at 149.)  Commenting on the diagnosis of

oppositional defiant disorder in Dr. Meyers' March 19, 2008, report, Ms. Altema explained that

"[o]ppositional defiant disorder is a disorder in which one has a tendency to react in a negative,

in a hostile and defiant way."  (Id. at 150-52.)  The CSE considered the diagnosis in connection

with the educational classification issue:

> We looked into it.  But it was felt that whether or not his condition adversely
> impacted his education, and that was not considered the case.  And as I mentioned
> before, students who have a diagnosis of oppositional defiant disorder often have
> social maladjustment.  So we did not feel that it was – that he fit the criteria of
> emotional disturbance.

(Id. at 152-53.)  Ms. Altema explained her understanding of the diagnostic conclusions in Dr.

Manov's April 26, 2008, report as follows:

> So basically axis one . . . was the clinical disorder that the therapist provided for
> [K.G.].  The major depressive disorder, it indicated that it – his feelings of
> depression, based on what the therapist indicated, it was a single episode and it
> was mild, and he mentioned that it was in full remission, meaning that it was not
> currently active – his feelings of depression.  He put anxiety disorder, not
> otherwise specified, which is usually for students who have some type of
> anxieties of – or underlying feelings of anxiety.
>
> . . .
>
> Not otherwise specified – meaning some type of model stage.  Conduct disorder
> adolescent onset, is students that have some type of behavior problems where
> they often violate the rights of others, or they violate the rules as presented or the
> societal norms.  And that was an onset; he mentioned that it was an adolescent
> stage.

(Id. at 157-58.)  This information was considered in making the classification determination.

According to Ms. Altema,

This validates our recommendation that [K.G.'s] level of depression was non-clinical, since it was in full remission. The conduct problems, as I mentioned before, can be with a lot of kids who have – are socially maladjusted will have this type of diagnosis.

. . .

So at the time, it did not seem that he fit the criteria for emotional disturbance classification. In addition, even though – may have a DSM diagnosis, it if doesn't adversely impact upon their overall education or performance, you still cannot consider that to be appropriate for them to get the classification of emotional disturbance. And at the time, [K.G.] was functioning age appropriately in school.

(Id. at 159.) A social history report dated July 15, 2008, (IHO Hr'g Ex. W) had also been considered and, according to Ms. Altema, "Basically, what I remembered, [K.G.] was behaving age appropriately – went into high school. And so that was a major factor in addition to the behavior problems stemmed from when he started the substance abuse and the truancy in school." (Tr. at 162.)

Ms. Altema made clear that the CSE's conclusion of non-disability was based on K.G.'s overall level of functioning as of the time of the meeting (i.e., February 2009) and that the CSE attributed the "behavior problems" to truancy, substance abuse and social maladjustment, conditions that Ms. Altema appeared to believe disqualified K.G. for disabled-student classification in any event. (See id. at 169-70, 171, 175, 205, 231, 246.) She also testified that, as noted in the document summarizing the CSE review session, the CSE concluded that K.G.'s depression disorder was secondary to his substance abuse. Ms. Altema attributed this conclusion to what the CSE perceived as simultaneous onset of drug use, behavioral problems, and depression, and the reports of depression remission and non-clinical significance after K.G.'s placement at Cross Creek:

> Because his behavior problems started when he started the substance abuse.  Prior
> to – prior to him using the substance abuse he was fine.  He was doing well in
> school.  There was no behavior or academic problems at all.  It is when the
> substance abuse started was when all the behavior problems were manifesting.

(Id. at 237.)

> Because at the time the parent mentioned that he had depression, he was also, he
> had an issue about the substance abuse.  And so we didn't feel that depression
> was the primary problem.  The primary problem seems to be the substance abuse.

(Id. at 246.)

> As I mentioned, we had the therapist's report that mentioned that his depression
> was in remission.  We had the psychological evaluation that indicates – the
> second psychological evaluation from Dr. Seely, that mentions that this level of
> depression was non-clinical . . .

> [T]hey didn't say it was secondary.  But they did mention that he had a history of
> substance abuse.  And that was the contributing factor to his behavior problems,
> and not the depression . . .

(Id. at 247.)

> Based on Dr. Seely's report, he mentioned that depression was not a significant
> factor, and that it was actually his substance abuse that was a factor to his
> behavior problems.  And so we felt that the depression was secondary to his
> substance abuse.

(Id. at 248.)  She stated that Dr. Meyer's March 2008 conclusion that K.G.'s "frequent loss of

temper, arguments and assaults, defiance, blame on others, resentfulness and spitefulness

typically causes clinical [sic] significant impairment in his social, academic and occupational

functioning" (IHO Hr'g Ex. AA-3) did not change her conclusion that K.G. was not disabled

> [b]ecause this timeframe that he was exhibiting these type of behaviors, it seemed
> to coincide with his substance abuse and with his social maladjustment.  And so I
> didn't feel that it would – I don't feel that it would change my recommendation,
> no.

(Id. at 250.)

On cross-examination, Ms. Altema conceded that, notwithstanding her earlier testimony indicating that a student engaged in substance abuse or whose evaluation indicated social maladjustment would not qualify for the emotional disturbance classification, indicators falling within the emotional disturbance criteria could suffice for eligibility:

> MR. WEINBERG: Is it your position that if a child is socially maladjusted that he or she is never emotionally disturbed?
>
> MS. ALTEMA: As I mentioned before, if they – if it adversely impacts upon their emotional functioning, excuse me, academic functioning, then it can be possible that they can have an emotional disturbance.  But it has to have also adversely and significantly impact [sic] upon their overall educational performance. . . . A student who is socially maladjusted can be considered . . . emotionally disturbed, if their overall academic performance is adversely impacted.
>
> MR. WEINBERG: So the issue is whether academic – if their academic functioning is impacted – is a more important issue than whether the child is socially maladjusted?
>
> MS. ALTEMA: In order – in order for them to be considered for special education services, under the IDEA, to be considered to have a disability classification, it has to adversely impact upon their overall educational performance.
>
> . . .
>
> MR. WEINBERG: So, if social maladjustment adversely affects a child's educational performance, then the child is emotionally disturbed under the IDEA?
>
> MS. ALTEMA: You could be classified, yes.
>
> MR. WEINBERG: My second question is about substance abuse.  Is a child – can a child who uses alcohol or drugs be classified as emotionally disturbed?
>
> MS. ALTEMA: Under the IDEA, no.
>
> MR. WEINERG: So any child who ever – who uses drugs or alcohol can never be classified as emotionally disturbed?

> MS. ALTEMA: I wouldn't say never.  There might be also other criteria that would be considered them [sic] for the emotional disturbance classification.
>
> . . .
>
> MR. WEINBERG: So, just to clarify, social maladjustment or substance abuse on their own could not classify a child as emotionally disturbed, but they don't preclude a child from being classified as emotionally disturbed?
>
> MS. ALTEMA: Depending on whether or not the behavior is adversely impacting upon their overall educational performance.

(Id. at 176-80 (intermediate colloquies omitted).)

Ms. Altema also appeared to acknowledge that truancy and dropping out are inappropriate behaviors that adversely affect academic performance, but considered social maladjustment and delinquency indicators to disqualify K.G. for the emotional disturbance classification:

> MR. WEINBERG: [The October 2008 Seely report] says that – it says reasons for referral.  It refers to drug use, dropping out of school, disrespect and getting into trouble with the law.  Would you consider those inappropriate types of behavior or feelings under normal circumstances?
>
> MS. ALTEMA: Those could be considered social maladjustment.

(Id. at 226.)

> MR. WEINBERG: And so the question is, is dropping out of school, being disrespectful and getting into trouble – in trouble with the law, inappropriate types of behaviors or feelings under normal circumstances?  Is that –
>
> . . .
>
> MS. ALTEMA: They are inappropriate types of behaviors.

(Id. at 229 (intermediate colloquy omitted).)

> MR. WEINBERG: Did [K.G.'s] dropping out of school, adversely affect his

Case 1:10-cv-04099-LTS   Document 35   Filed 05/18/11   Page 27 of 54

educational performance?

> MS. ALTEMA: Well, if it is truancy, not being in school, obviously that would affect him in performance.  But then again it is more of an issue of social maladjustment and delinquency as opposed to emotional disturbance.

(Id. at 231.)  Ms. Altema proffered no further explanation of her understanding of the

relationship between social maladjustment or delinquency and emotional disturbance.

Jean Jepson, a "family representative" from Cross Creek who was neither a

therapist nor an educator, testified that, upon arrival at Cross Creek, K.G. "did not love himself

at all . . . He wasn't nice to talk to . . . He was basically, I think, very angry and did not like

himself."  (Id. at 112, 115-16.)  She further testified that his affect "created some issues" and that

he learned that he had to be nice and respectful at Cross Creek.  (Id.)  She acknowledged that

K.G.'s anger problem presented some learning process issues, but stated that "he learned real

fast that we didn't tolerate the anger, you know, we didn't tolerate the outlashing stuff . . . So he

learned fast to do what he needed to do to that he could concentrate and things like that."  (Id. at

113.)  By the time he left Cross Creek, K.G. "was very . . . powerful and loved himself.  He was

not the angry child that he was before he learned all about being respectful."  (Id. at 114.)

Dr. Manov, the psychiatrist who had prepared the April 26, 2008, Cross Creek

intake report (IHO Hr'g Ex. T), testified for Plaintiffs that K.G. suffered from depression and

anxiety that affected his educational performance:

> [Y]ou know, he needed, kind of, an adjustment and, you know, to improve his mood, and also to improve his functioning in the context of his mood disturbance. And so, you know, there was improvement in all areas of functioning, including the educational functioning.  You can have social, educational, and also, kind of, biological functioning; the way he feels, his energy, his body, and how he eats, sleeps.  But fortunately, he improved with the treatment.

(Tr. at 264-65.)  He opined that, because symptoms of depression and anxiety continued after

IDEA.WG.WPD          VERSION 5/18/11                                                                                          27

K.G. "quit doing drugs and alcohol," it is "more likely than not that factors other than substance
abuse caused his anxiety and depression." (Id. at 265-66.)  Later during his Cross Creek stay,
Manov took K.G. off of his medications.  (Id. at 267.)  As to K.G.'s IDEA eligibility, Dr. Manov
responded to Plaintiffs' counsel's question as to whether Dr. Manov believed the K.G. "meets
the definition of emotional disturbance under IDEA" as follows:

> Yeah, because of the severity of his disorder, you know, it is major depression.
> You know, this is a severe disorder.  And also, the duration for which he was
> having symptoms, which is several months.  He meets criteria for that.  And, you
> know, and he had, as I said before, multiple impairments in different areas of his
> functioning in educational, social. . . . in multiple areas, like, educational, social,
> legal. . . . You know, he wasn't functioning well in any of these areas. You know,
> he was having problems.

(Id. at 281-82.)  On cross-examination Dr. Manov elaborated on his understanding of the IDEA
criteria for emotional disturbance:

> The criteria for IDEA is, you know, to have a severe and persistent mental illness,
> which, you know, kind of leads to impairment of functioning.  And so, like, - -
> impaired functioning, but, you know, it doesn't fall into this criteria in terms of,
> you know, there is a less severe impairment.  And although, like, the kid may not
> succeed in school, it's kind of proportional to his or her potential.  You know,
> with IDEA, the kids have major impairment in more than one area.  And so, and
> in that regard, he meets the criteria for emotionally disturbed under IDEA .
>
> [DEFENDANT'S COUNSEL:] I'm sorry.  In which capacity?
>
> DR. MANOV: In the capacity, like, to perform his duties as a student, to function
> socially as an adolescent his age, to have appropriate relationships with his
> family, and also to stay out of trouble with the law.  And so he, you know, he
> wasn't functioning in any of these areas.

(Id. at 282-83.)

Brian Parker, a Cross Creek therapist who holds degrees in psychology and
counseling, testified that he had provided approximately five hours of group therapy to K.G. on a

weekly basis at Cross Creek.  As to K.G.'s initial mood at the beginning of his stay at Cross

Creek, Parker testified that

> [K.G.] presents as a very angry young man.  In getting to know [K.G.], there was
> the irritability that was definitely there.  And he presented as clinically depressed
> with irritability as one of the symptoms of that.

(Id. at 296.)  Parker further opined:

> I don't think [K.G.'s] depression was caused by his substance abuse, I think it
> was exacerbated by his substance abuse.  I think [K.G.] used substances in order
> to attempt to self-medicate some of the depression and feelings of general
> unhappiness that he exhibited. . . . I don't think his substance abuse caused his
> depression.  In fact, - - you can better attribute the depression to the chemical
> dependency with the diagnosis of depression.

(Id. at 298.)  In response to a question by Plaintiffs' counsel, Parker testified that K.G. had

depression to a marked degree that adversely affected his educational performance.  He

explained further:

> [K.G.'s] depression affected his academic performance in that he was not very
> motivated to participate in school.  And that it also - - poor self-esteem issues - -
> to where he actually had convinced himself that he wasn't capable of participating
> in school.  Oftentimes, he would not go or he would refuse to do the schoolwork.
> And sort of quitting on his terms, so that he didn't have to try and fail, and that he
> just wasn't going to do it.  And that way, he would be able to preserve some of his
> self-image, self-esteem, that he tried hard to portray.

(Id. at 300.)  K.G.'s depression improved at Cross Creek, according to Parker, in that K.G. was

no longer taking medication for depression upon discharge, "[a]nd he also no longer qualified for

a diagnosis of depression."  K.G. began to participate in school and earned a high school

diploma.  (Id. at 300-01.)  K.G. ceased to qualify for a depression diagnosis after about eight

months of the Cross Creek program.  (Id. at 306.)

Cross Creek's principal, Douglas Bishop, testified as to the academic program

provided for K.G., and described the school as a "residential treatment center, 24-hour

lockdown, with a strong high school program and therapy program for students." (Id. at 371.)

Dr. Seely, who had performed the October 2008 assessment and clinical

evaluation, testified as to his findings.  In response to questions by Plaintiffs' counsel as to how

K.G. felt about school and whether those feelings were inappropriate, Dr. Seely testified:

> [K.G.'s] general feeling about school was summed up in he hated school, he
> didn't want to be in school, he'd rather be anywhere with other people and often
> would fight with his parents about school whenever that subject came up.
>
> . . . [The feelings] would go along with the diagnosis of the conduct disorder that
> he has against authority and any kind of authoritative structure, especially that
> that was in school with him having significant problems with his teachers.

(Id. at 397.)  Asked whether K.G. had "those feelings over a long period of time," Dr. Seely

responded that "[h]e did.  He reported that those started in the sixth grade and that even in the

elementary school he seemed to usually have problems with his teachers."  (Id. at 397-98.)  As to

the effect of these matters on educational performance, Dr. Seely testified:

> We see that his overall skills are in the average range of 84, with specific
> difficulties in his reading comprehension and his reading composite level skills,
> in his ability to perform rote math tasks.  And in his written expression they're an
> 85 as well.
>
> Now, although they are not at a level that constitutes a learning disorder, these do
> point to him having more frustration and difficulty in school, which has primarily
> been affected by his difficulties with authority and his unwillingness to participate
> in the educational process.

(Id. at 400-01.)  Asked about "the difference between narcissistic personality traits and

narcissistic personality disorder," Dr. Seely explained that

> The difference between narcissistic personality traits and narcissistic personality
> disorder is that the disorder cannot be formally given to an individual until after

they are 18 years old.  But given that [K.G.] met all the criteria for a personality disorder other than being 18, then the direction of therapy needs to be pointed toward helping him treat these narcissistic personality traits that had he been 18 he would've probably had the diagnosis of narcissistic personality disorder.

. . .

These would be something that develop over a long period of time and that he was still developing as an adolescent.  And that these narcissistic personality traits contribute to a lot of his justifications of his behaviors to his feelings that he was entitled to engage in the behaviors that he had done.  And then also, to overlook many of the things that he had done as being something that was not relevant to him or not important to him.

(Id. at 402-03.)  As to the effect on K.G. of the feelings of entitlement, Dr. Seely continued:

They contributed a great deal to his conduct disorder in which he engaged in many illegal activities to him participating in the beating of some kids at which he was charged by the courts, and his general demeanor with his teachers.

He had had problems with teachers for a long time and this is part of the development of these traits is the difficulties that he had and the entitlement that he felt.  He often would blame his teachers for his problems and then not participate in school and then that non-participation would contribute to him having difficulties and being able [sic] to perform in the classroom.

(Id. at 403-04.)  According to Dr. Seely, the traits were "not caused by drug and alcohol use, although, that – those are probably a result of the general feeling that he was entitled that the laws and rules didn't apply to him and those things which would generally be associated with his conduct disorder."  (Id. at 404.)  Dr. Seely further noted that K.G. "also had those developments of conduct disorder traits being that he was giving oppositional defiant behaviors in earlier grade school years that was then a symptom of those problems with his behavioral difficulties."  (Id. at 407.)  Dr. Seely acknowledged that oppositional defiant behaviors, conduct disorder, narcissistic personality and narcissistic are all diagnoses that come within the DSM-IV.  (Id.)

Dr. Robert Meyers, who had performed the March 2008 clinical assessment (IHO

Hr'g Ex. AA) and also submitted a letter dated March 18, 2009 (IHO Hr'g Ex. P), testified that

he holds a Ph.D. in school psychology and worked as a school psychiatrist for the New York

City Board of Education for about 20 years.  He began treating K.G. as a therapist in about

October 2007.  (Id. at 429-30.)  Dr. Meyers described K.G.'s behavior in April 2008 as

> [P]retty much non-functioning.  I mean, he wasn't attending school at all.  He was getting into trouble almost on a daily basis.  He was fighting.  He was angry.  He was depressed.  He wasn't coming out of his room and when he did he was causing havoc in his family.  I mean, in every important aspect of his life, whether it was social or what, he was not functioning.

(Id. at 431.)  Asked about K.G.'s "attitude toward a possible future," Dr. Meyers responded:

"Very depressed.  Very delusional like nothing's ever going to happen to him."  Dr. Meyers

described K.G.'s "mood" as "depressed, withdrawn," and K.G.'s "attitude toward authority" as

"Didn't give a damn, if I can use that word.  Nothing seemed to impress him.  He wasn't

threatened by anything, couldn't give a damn."  (Id. at 431-32.)  As to whether that attitude

carried over to his feelings toward teachers, Dr. Meyers testified "Yeah.  I guess if I had to come

up with one word it would be hopeless.  He didn't see any hope for anything."  (Id. at 432.)

Regarding K.G.'s relationships with peers, Dr. Meyers testified that

> He had a couple of friends that he hung out with a lot.  They were probably the wrong choice because these kids were not the kind of kids you want him to be hanging out with.  He had one or two friends that I guess you would call them friends, but mostly it was an antagonistic kind of thing.  These were kids that got into lots of fights with him and in a sense maybe even fostered that.  Not good kids.

(Id. at 432-33).  As to K.G.'s level of academic functioning at the commencement of the

therapeutic relationship, Dr. Meyers stated

> Well, as I said, he wasn't functioning in a sense that, I mean, his potential was

> way up there, but he just wasn't even attending.  I mean, this kid was not going to school, was not going to any of the programs that were offered to him.  He just wasn't going.

(Id. at 433.)  By March of 2008, the academic functioning was "non-attentive.  I don't think that there was – I mean, my opinion is he could've been doing a lot better, but he was not attending."

(Id. at 433-34.)  His opinion as to program and placement recommendations in March 2008 was

> That this kid was not going to be able to make it in any of the New York City programs that were being offered to him.  In fact, he wasn't even going to go to them, so it was almost useless.

(Id. at 435.)  Dr. Meyers believed that K.G. needed a residential setting "because he wasn't attending any of the programs and because he was at a point where he needed to have controls placed on him before I felt he would hurt somebody else or hurt himself."  (Id.)  Explaining why he believed that K.G. was not attending school, Dr. Meyers stated:

> I believe he was seriously depressed, I believe there were other things, too.  I believe he was using drugs at that time and hanging out with the wrong people.

(Id. at 436.)  Asked to describe his general understanding of Defendant's criteria for emotional disturbance, Dr. Meyers responded:

> Well, you basically rule out the fact that it's not an intellectual thing.  And you look at relationships, you look at behaviors, and then basically you look to see if he reacts to certain things and in the same way most people would - - what his mood is, his symptoms and generally how he's doing.

(Id. at 437.)  Asked whether K.G. was able to maintain satisfactory interpersonal relationships with peers and teachers in March 2008, Dr. Meyers responded:

> It just wasn't happening - -
>
> . . .

> In that [March of 2008] point in time, it was not happening at all.  There were no
> relationships.  Even with his parents.  The only relationship existed when he
> called them because he got into trouble, but there was not relationship really
> going on there.  There was no relationship with friends.  There was no
> relationship with peers.  And any relationship that existed with a - - almost in a
> sense of power where [K.G.] perhaps had the power to fight, not to fight, to be the
> leader there.

(Id. at 438.)  These matters affected K.G.'s educational performance by "[one h]undred percent.

By him not going.  Listen, this is a kid in the tenth grade who basically dropped out."  As to

inappropriate behaviors and their roots, Plaintiff's counsel elicited the following testimony:

> MR. WEINBERG: Did [K.G.] have behavior or feelings that you would consider
> inappropriate?
>
> . . . [Objection; time frame of question clarified as March 2008]
>
> DR. MEYERS: Yes.  Yes, I did.
>
> MR. WEINBERG: Did they affect [K.G.'s] educational performance?
>
> DR. MEYERS: Yes, 100%.
>
> MR. WEINBERG: And how did they affect it?
>
> DR. MEYERS: Well, by the fact that he wasn't going.  He wasn't doing anything.
> He wasn't keeping up with any kind of classes at all.  In fact, if I remember
> correctly, he wasn't even doing sports anymore and that was one thing that he
> always loved to do.  He had just dropped out of everything.  This was a kid that
> was in a deep depression and just not able to go – just not able to muster up the
> energy to go to school even for the subjects he enjoyed.
>
> MR. WEINBERG: And what was the source of [K.G.'s] emotional difficulties or
> depression?
>
> DR. MEYERS: What was the source?  I don't think there was just one source.  I
> think friends had a relationship with it.  I think his own physical and mental state
> had a lot to do with it.  I think drug usage had a lot to do with it.
>
> MR. WEINBERG: Do you think that the emotional difficulties were caused by
> the drug and alcohol use?

DR. MEYERS: I think they went hand in hand.

. . .

What I'm trying to say is that I think that the emotional problems were there and the drugs and the marijuana and things like that were just attempts to self-medicate, to cover up.

(Id. at 439-41.) On cross-examination, Dr. Meyers explained that he had written his March 2009 letter (IHO Hr'g Ex. P) at K.G.'s parents' request, "to explain my feelings about [K.G.] and what he needed." (Tr. at 443.)

K.G.'s mother, M.G., testified that K.G. had no emotional problems in high school until March of his 10th grade year, in 2007. (Id. at 465.) She received calls from his teachers, one of whom "expressed that [K.G.] was not the same person he was. He became very withdrawn, he was not doing his work – in her opinion. He was depressed. And then became, after a while, showed anger when she would ask him to do his school work." (Id. at 465-66.) K.G. had never failed a class prior to that semester. (Id. at 466.) He was diagnosed by Dr. Gurvits with major depressive disorder in the summer of 2007 and put on Zoloft and Buspar. (Id. at 492-95.) He revealed his marijuana use to the parents in the summer of 2007, saying "while he was depressed that he started to smoke pot because it made him feel better." (Id. at 499.)

Following the change in K.G.'s schedule at Madison in the fall of 2007, certain of the teachers criticized his level of progress. K.G. "resented them and showed resentment to the way they treated him." (Id. at 470.) M.G. spoke with the school guidance counselor, explaining that K.G. had been diagnosed with major depressive disorder and was on medications and asking for a return to the prior schedule, but was rebuffed. Thereafter, K.G. stopped going to school:

> He told me he could not stay in the school, he was miserable, he was unhappy,
> you know, he wanted his old schedule back. . .  He was just so depressed that any
> way I tried to help him he was not receptive.  He was just - - did not want to
> attend school any longer.

(Id. at 471-73.)  K.G. had stopped attending school by November of 2007.  (Id. at 492.)

After the parents forced K.G. to go to Cross Creek, M.G. testified, the depression

diminished and, academically,

> He started to do well.  He liked the teachers and the way they worked with him,
> he said it was a great help.  He wasn't forced, he said, to do anything.  It was at
> his pace, his own pace, with teachers willing to work with him at his own pace.

(Id. at 479.)  As to the changes she observed after his return from Cross Creek, M.G. testified:

> The most important I'll say first, is the love for my husband and I.  He's always
> telling us, you know, how much he loves us and you saved my life, I needed this
> school.  And he just constantly thanks us.  He's responsible.  If a problem occurs
> when he's out, he walks away from it now, and tries to mediate.

(Id. at 480.)

F.  IHO Determination

In a decision dated October 27, 2009, the IHO found that the district had failed to

provide K.G. with a Fair Appropriate Public Education ("FAPE"); that the district had not

provided an adequate explanation for its initial non-responsiveness with regards to the parents'

referral; that K.G. qualified as an IDEA-covered child with a disability because he had

depression affecting his educational performance; that the program at Cross Creek was

appropriate for K.G., who made meaningful progress there; that the Cross Creek program was

reasonably calculated to provide educational benefits to K.G.; that Plaintiffs cooperated with the

school district; and that equitable considerations offered no basis for ruling against Plaintiffs.

(IHO Dec. at 8-11.[14])  The IHO ordered the district to reimburse Plaintiffs for K.G.'s $4,995.00

monthly Cross Creek tuition costs in a sum total of $60,237.00.  (Id.)

G.  SRO Appeal and Determination

   Defendant appealed the IHO Decision.  The SRO rendered his decision on

January 21, 2010.  The SRO held that K.G. did not meet any of the criteria for eligibility for the

emotional disturbance classification, and did not address whether Cross Creek was appropriate

or whether the equities favored reimbursement.  The SRO found that the hearing record

supported the CSE's February 2009 determinations regarding K.G.'s then-current levels of

functioning and that his February 2009 status was the appropriate basis for the IEP

determination:

> In view of the evidence . . ., I find that, at the time of the February 2009 CSE
> meeting, the student did not meet one or more of the criteria for eligibility as a
> student with an emotional disturbance.  Even if the student had met one or more
> of the criteria, I find that the hearing record does not indicate that the student
> required special education services as a result.  Therefore, I find that the impartial
> hearing officer erred by determining that the student was eligible for special
> education services as a student with an emotional disturbance.

(SRO Dec. at 21.)

   With respect to Plaintiffs' complaints, raised in the petition for the IHO hearing,

that their procedural rights had been violated insofar as the DOE had failed proactively to

identify K.G.'s needs, failed to respond in an appropriately timely fashion to the parents'

inquiries and to proceed with IEP evaluation and development on the required timetable and,

overall, failed to afford the parents a meaningful opportunity to participate in the development of

---

[14] "IHO Dec." refers to the October 27, 2009, decision of Impartial Hearing Officer
Nancy M. Lederman.

an IEP for the 2008-09 school year, the SRO found that: although there had been delay beyond the normal 30-day limit in obtaining parental consent for evaluation, some of the delay was attributable to the parents; the normal 60-day evaluation deadline was inapplicable because the parents had removed K.G. from the state and would not make him available for evaluation by the CSE, thereby contributing to the delay in obtaining an evaluation until October 2008; concluding that the hearing record did not show that the procedural inadequacies "(a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits." (Id. at 14-15.)

The SRO concluded that tuition reimbursement was not appropriate, and reversed the IHO's tuition reimbursement determination.[15]

Plaintiffs filed a timely complaint in this Court seeking review of the SRO's decision, as authorized by 20 U.S.C. § 1415(i)(2)(A) and N.Y. Educ. L. §4404(3)(a). Plaintiffs and Defendant cross-move for summary judgment.

### III. DISCUSSION

#### A. Standard of Review

In a civil action brought for review of IDEA findings and determinations, the court is required to receive the records of the administrative proceedings, hear additional evidence at the request of a party, and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate." 20 U.S.C.A § 1415(i)(2) (West 2010). Reasonable attorney's fees may be awarded to a prevailing party. Id. § 1415(i)(3)(B).

---

[15]   There had been no appeal from the IHO's award of reimbursement for the cost of the Seely evaluation.

The parties' submissions are structured as motions for summary judgment. However, the procedure, in substance, is an appeal from an administrative determination. Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005). Thus, unlike in ordinary summary judgment motion practice, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. Viola v. Arlington Cent. School Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). Rather, the court conducts an independent review of the administrative record, basing its decision on the preponderance of the evidence developed at the administrative hearings and any further evidence presented by the parties. Bd. of Educ. of Hendrick Hudson Central School Dist. v. Rowley, 458 U.S. 176, 205 (1985). Summary judgment thus serves "as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." Lillbask, 399 F.3d at 83 n.3.

Questions as to whether a child meets the criteria for being emotionally disturbed involve interpretation of the IDEA and the definition of "emotional disturbance" under applicable federal and New York State regulations. In this situation, "the district court [is] as well-positioned as the state administrative officials to determine [a student's] eligibility." Muller v. Comm. on Special Educ. of the E. Islip Union Free Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998). A district court is not required to give state administrative proceedings special weight when the administrative decision concerns an issue of law. Id. (citing Mrs. B v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997)). Accordingly, this Court considers de novo whether K.G. met the statutory requirements for a disability. See, e.g., N.C. ex rel M.C. v. Bedford Cent. School Dist., 473 F. Supp. 2d 532, 542 (S.D.N.Y. 2007).

When reviewing educational determinations made pursuant to the IDEA,

however, the role of the courts is circumscribed and "courts may not substitute their own notions of sound educational policy for those of the school authorities which they review." T.Y. & K.Y. ex rel T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009) (internal quotation and citation omitted). The district court must give due weight to the administrative proceedings to the extent they address the suitability of educational programs, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve educational policy issues. A.C. ex rel. M.C. v. Board of Educ., 553 F.3d 165, 171, 173 (2d Cir. 2009). Deference is "particularly warranted where the district court's decision [is] based solely on the administrative record; and when the state hearing officers' review has been thorough and careful." Id.; see also Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

B. IDEA Procedural Compliance Issues

The CSE and the SRO rejected K.G.'s family's contention that he was a child with a disability at the relevant time, prescribing general education as appropriate for him. "Generally, two questions are relevant to a federal court's review of a challenged IEP under the IDEA: (1) whether the state complied with the procedural requirements of the Act; and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" M.C. v. Voluntown Board of Education, 226 F.3d 60, 65 (2d Cir. 2000) (citations omitted). Here, there were violations of the procedural timetable established by the IDEA and New York state regulations, and there are disputed factual questions as to whether and to what extent K.G.'s mother informed Madison officials prior to March 2008 of K.G.'s major depressive disorder diagnosis in connection with truancy inquiries or otherwise. "'However, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA.'" A.C. ex rel. M.C., 553 F.3d at 172 (quoting Grim v. Rhinebeck

Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003)).  "Such errors will not negate the adequacy of

an IEP where the child's education has not been affected and the parents have not been deprived

of meaningful participation in the process."  N.C. v. Bedford Central Sch. Dist., 300 Fed. App'x

11, 14 (2d Cir. 2008).  The extensive administrative record, which includes privately-developed

therapeutic and evaluative input submitted by the parents, as well as their own testimony about

and documentation of their attendance at the CSE meeting with an advocate, establishes that they

were afforded a meaningful opportunity to participate in the IEP process for the 2007-08 and

2008-09 school years, and did in fact participate.  It also demonstrates that the extended length

of the process was attributable in part to K.G.'s parents' decision to place him in an out-of-state

institution from which he could not be returned for in-person District evaluation, and the parents'

selection of an evaluator who had a lengthy waiting list.

Furthermore, as explained below, the preponderance of the evidence does not

establish that K.G. was in fact eligible for services under the IDEA.  The Court thus turns to the

questions regarding substantive merit of the DOE's determination regarding K.G.'s eligibility

and the Plaintiffs' request for reimbursement of the costs of K.G.'s education and treatment at

Cross Creek.

C.  IDEA Merits Issues

1.  Burlington Test

> In determining whether parents are entitled to reimbursement [for the cost of a
> unilateral private school placement], the Supreme Court has established a two
> part test: (1) was the IEP proposed by the school district inappropriate; (2) was
> the private placement appropriate to the child's needs.  See [Sch. Comm. Of the
> Town of] Burlington [v. Dep't of Educ.], 471 U.S. [359] at 370 [(1985)]; Frank
> G. v. Bd. Of Educ., 459 F.3d. 356, 364 (2d Cir. 2006).  The party who
> commenced an impartial hearing - in this case, the parents - bears the burden of
> persuasion on both Burlington factors.

Gagliardo, 489 F.3d at 111-12 (parallel citations omitted).

The question of the propriety of the general education plan proposed for K.G. by the DOE turns in the first instance on whether he was, in fact, a child with a disability within the meaning of the IDEA during the period for which Plaintiffs seek reimbursement. The parties agree that there is no evidence that K.G. suffered from any learning disability, and there is no evidence of any physical handicap. Accordingly, the Court's de novo determination must focus on whether K.G. was entitled to classification and services under the "serious emotional disturbance" prong of the statute and regulations.

### 2. Emotional Disturbance Defined

New York's regulation defines "emotional disturbance" as

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance:
>
> (i) an inability to learn that cannot be explained by intellectual, sensory or health factors;
> (ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
> (iii) inappropriate types of behavior or feelings under normal circumstances;
> (iv) a generally pervasive mood of unhappiness or depression; or
> (v) a tendency to develop physical symptoms or fears associated with personal or school problems.
>
> The term includes schizophrenia. The term does not apply to students who are socially maladjusted, unless if it determined that they have an emotional disturbance.

N.Y. Comp. Codes & Regs. tit. 8, § 200.1. Plaintiffs argue that K.G. was entitled to classification as a child eligible for services under the IDEA by reason of emotional disturbance indicated by criteria (i), (ii) and (iii). (Pls.' Mem. of Law in Supp. of Mot. For Summ. J. at 6–11.) As discussed above, the CSE found K.G. ineligible under each of the criteria, based on

his reported level of functioning as of February 2009 and the CSE's conclusion that any impairment of his academic functioning was attributable to substance abuse rather than depression.  The IHO, in granting relief, found that Plaintiffs had demonstrated that K.G. suffered the requisite level of impairment resulting from major depression, and the SRO again denied relief on the basis of his finding that K.G. was not impaired in February 2009.

This Court examines the statutory and regulatory language and the case law to determine what types of conditions and symptomology are embraced by the emotional disturbance rubric, and also considers de novo the record as to the etiology of K.G.'s academic problems insofar as they were manifested during the period for which Plaintiffs seek reimbursement for the Cross Creek placement.

### 3.  Emotional Disturbance and Social Maladjustment

The IDEA provides that the term "child with a disability" includes a child "with . . . serious emotional disturbance . . . who, by reason thereof, needs special education and related services."  20 U.S.C.A. § 1401(3)(A) (West 2010).  New York's definition of emotional disturbance requires the presence of one or more of the enumerated criteria, to a marked degree and over a long period of time, and a showing that the condition or behavior satisfying the criterion adversely affect the student's educational performance.  The language of the regulation thus requires a connection between the criterion relied upon and adverse performance; the "emotional disturbance" rubric plainly suggests that the condition or behavior relied upon to establish the relevant criteria be emotional in nature, rather than attributable to some other cause. The IDEA, similarly, clearly requires that the need for special educational and related services

stem from a "serious emotional disturbance" or another condition enumerated in the statute.[16]

That not all manifestations of the criteria specified in New York's emotional disturbance regulation are sufficient to warrant disability classification based on emotional disturbance classification, even where there has been a decrement in academic performance, is made clear by the last sentence of the regulation's emotional disturbance subdivision, which expressly excludes "social maladjustment" as a basis for a finding of emotional disturbance "unless it is determined that [the student has] an emotional disturbance." See N.Y. Comp. Codes & Regs. tit. 8, § 200.1. This somewhat circular-sounding qualifier would be meaningless if simple demonstration of the criteria and adverse academic performance were sufficient in all cases to warrant the emotional disturbance disability classification. See Negonsott v. Samuels, 507 U.S. 99, 106 (1993) (statutes should be interpreted in a way that "gives effect to every clause and word of the statute") (internal quotations and citations omitted). Read to indicate that social or behavioral problems are insufficient, but do not preclude an emotional disturbance classification if other emotional problems are present and meet the regulatory criteria, the exclusion demonstrates that the classification remains available to all eligible children but is not intended to require local educational authorities to accommodate all behavioral problems that may impede learning.

Some courts have focused on conduct disorder as opposed to mood disorder diagnoses in drawing the distinction; some use the nomenclature of "juvenile delinquency." However it is parsed, the distinction between emotional disturbance and other underlying social or behavior problems is significant – the IDEA does not require school districts to undertake the

---

[16]     None of the other statutorily-enumerated disabling conditions is relevant here.

responsibility of, for instance, forcing a child physically to attend school when the child is a

neither unable to attend nor impeded by an emotional condition to a marked degree in following

through on his ability to attend  As the Fourth Circuit explained in <u>Springer v. Fairfax Co. Sch.</u>

<u>Bd.</u>, 134 F.3d 659, 664 (4th Cir. 1998):

> Courts and special education authorities have routinely declined . . . to equate
> conduct disorders or social maladjustment with serious emotional disturbance. . . .
> Indeed, the regulatory framework under IDEA pointedly carves out "socially
> maladjusted" behavior from the definition of serious emotional disturbance.  This
> exclusion makes perfect sense when one considers the population targeted by the
> statute.  Teenagers, for instance, can be a wild and unruly bunch.  Adolescence is,
> almost by definition, a time of social maladjustment for many people. . . . Any
> definition that equated simple bad behavior with serious emotional disturbance
> would exponentially enlarge the burden IDEA places on state and local education
> authorities.  Among other things, such a definition would require the schools to
> dispense criminal justice rather than special education.

(citations omitted.)  The <u>Springer</u> Court found that the emotional disturbance classification had

properly been rejected where there was only weak, conclusory evidence pointing to any

emotional condition and the "precipitous drop in [the student's] grades . . . appear[ed] to be

directly attributable to his truancy, drug and alcohol use, and delinquent behavior rather than to

any emotional disturbance."  <u>Id.</u> at 665, 666.

    <u>4.  The Record Does Not Support an Emotional Disturbance Classification</u>

       Here, the preponderance of the evidence indicates that the academic problems

presented by K.G. in the fall and winter of 2008 were the result of his truancy – he failed his

classes because he refused to go to school at all – and that the refusal behavior was principally

the product of a conduct disorder, narcissistic personality tendencies and substance abuse rather

than of depression, an emotional disorder from which he suffered to differing degrees from some

time in 2007.  That his conduct was unacceptable and dangerous is made clear by his fighting,

the legal consequences of his fighting, and his substance abuse.  His parents made a brave step in

sending him to Cross Creek that no doubt gave him a new pathway to a productive, safer life.

The evidence does not, however, demonstrate that he suffered during the time for which

reimbursement is sought from an emotional disturbance manifesting itself in one or more of the

enumerated criteria that was present to a marked degree and adversely affected his academic

performance.  The principal evidence, and the Court's de novo determinations as to its weight

and significance, can be summarized as follows.

Dr. Meyers, a former school psychologist who treated K.G. from at least the fall

of 2007, diagnosed K.G. in March 2008 as suffering from Oppositional Defiant Disorder, stating

that "[K.G.'s] recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward

peers and authority figures falls within the scope of Oppositional/Defiant Disorder," and that

K.G.'s "frequent loss of temper, arguments and assaults, defiance, blame on others, resentfulness

and spitefulness typically causes clinical[ly] significant impairment in his social, academic and

occupational functioning."  (IHO Hr'g Ex. AA-2 to AA-3.)  The March 2008 report does not

mention depression, although it does characterize K.G. as having "many serious emotional

problems" in the interpersonal area.  (IHO Hr'g Ex. AA-2.)  Dr. Meyers' 2009 IHO hearing

testimony characterizes K.G. as having been depressed at the time of the original report, but does

not explain the lack of a depression diagnosis in the original report, and is also inconsistent with

the original report, and thus unpersuasive, as to the effect of the depression on K.G.'s academic

functioning.  Dr. Meyers testified that K.G. was "depressed, withdrawn" and "non-functional" in

April 2008, but also acknowledged that K.G. "hung out . . . a lot" with friends who were a bad

influence on him, and that the academic non-functioning consisted of not attending school.

According to his IHO hearing testimony, Dr. Meyers testified that he recommended a residential

placement because K.G. would not go to any New York City programs that were offered to him, and "was at a point where he needed to have controls placed on him before I felt he would hurt somebody else or hurt himself."  Although he attributed K.G.'s truancy to being "seriously depressed," Dr. Meyers also acknowledged K.G.'s drug use and "hanging out with the wrong people" as influential in the behaviors.  (Tr. at 432-36.)

        Dr. Manov, who evaluated K.G. shortly after his placement at Cross Creek, diagnosed K.G. as having "Major Depressive Disorder, single episode and currently in full remission . . . Anxiety disorder, NOS, Conduct Disorder Adolescent Onset," noted that K.G. had dropped out of school and had legal problems, and set K.G.'s GAF (Global Assessment of Functioning) at 65.  According to the DSM-IV, a diagnosis of "full remission" of Major Depressive Disorder "requires a period of at least 2 months in which there are no significant symptoms of depression."  (DSM-IV at 412.)  A GAF rating of 65 is indicative of "some mild symptoms . . . OR some difficulty in social, occupational or school functioning . . ., but generally functioning pretty well, [and having] some meaningful interpersonal relationships."  (Id. at 34.) Dr. Manov reported that K.G. had chosen to come to Cross Creek to avoid jail, and that he had quit school due to anxiety and irritability about the legal charges.  K.G. is described in the report as having no suicidal tendencies, having an ability to enjoy social activities, and as having calmed down and feeling better after entering the program.  (IHO Hr'g Ex. T.)  The report thus indicates that K.G. was not suffering from depression-related educational difficulties at the time he was placed at Cross Creek.  Dr. Manov's 2009 IHO hearing testimony that K.G. suffered in April 2008 from depression and anxiety that affected his educational performance was conclusory and evasive with respect to any specific connection between the depression and academic performance, and thus adds nothing of significance to the question of the etiology of

K.G.'s truancy and defiant behavior at the time of the Cross Creek placement.

The most comprehensive and detailed report in the record was prepared in October 2008 by Dr. Seely, the Cross Creek-affiliated independent consultant whom K.G.'s parents retained to perform the psychoeducational analysis that was required for the IEP process. Dr. Seely's 17-page report opines that K.G. showed no clinical signs of depression; Dr. Seely identified K.G.'s Axis I clinical disorders as: Conduct Disorder, Child Onset, Moderate Cannabis Dependence and Alcohol Abuse.  As to Axis II, which is used to identify personality disorders, Dr. Seely recorded a diagnosis of Narcissistic Personality Traits, and under Axis IV, Psychosocial and Environmental Problems, he identified "problems related to drug abuse, social environment, familial and relational problems."  Dr. Seely assigned K.G. a GAF level of 55.[17] His narrative links K.G.'s negative attitude to educational achievement and behavioral problems to certain intellectual difficulties that do not rise to the level of a learning disorder, "but are likely to contribute to more difficulties in school and frustration in the learning process."  (IHO Hr'g Ex. Z-14 to Z-15.)  According to Dr. Seely, K.G. was clearly "capable of average levels of work if he provides a concerted and concentrated effort in school," but his productive participation in school "[did] not appear likely due to his oppositional and behavioral difficulties . . ."  (Id.)  Dr. Seely squarely identified K.G.'s academic problems, and his need for the structured institutional setting, with his behavioral problems:

> [H]is academic difficulties are compounded by his behavioral difficulties. . . . He continues to have oppositional difficulties that will interfere with his level of motivation, although a consistent environment of behavior structure is reported to

---

[17]     A GAF of 55 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  (DSM-IV at 34.)

> have helped in him applying himself to school.  This environment will be
> necessary until he can work through other behavioral difficulties and can take
> more personal responsibility for himself and his schoolwork . . .
>
> [K.G.'s] testing indicated that his difficulties are focused on behavioral acting out
> and oppositional attitudes and chemical abuse, with some developing personality
> traits.

(IHO Hr'g Ex. Z-14 to Z-15.)  He specifically acknowledged K.G.'s mother's reports of

depressive symptoms and rejected such symptoms as current causative factors: "Mother implied

that past difficulties with depressive difficulties were a major component of his need for

treatment, but these were not seen as prevalent in his current testing. . . . Testing indicated that

his main difficulties are a disregard to social standards and problems in acting-out and

impulsivity."  (Id.)

Dr. Seely classified K.G.'s difficulties as "meet[ing] criteria for a Conduct

Disorder," and opined that K.G. "will require a restrictive behavioral environment to challenge

his ideals and beliefs about his behaviors. . . . [K.G.] currently worried about being placed in

prison and consequences that could result from this, but he will need to get beyond a mere fear

of punishment and see how prosocial behaviors will help him and his life."  (Id.)  He added that

K.G.'s symptons also "suggest the development of Narcissistic Personality traits, which are

likely to further his oppositional ideals and acceptance of his acting out behaviors. . . . These

narcissistic attitudes are likely to be counterproductive to his behavioral interventions, and will

need to be addressed in his individual therapy."  (Id. at 15.)  Dr. Seely also recognized K.G.'s

substance abuse and chemical dependence problems, commenting that interventions and

involvement in 12-step programs will be necessary.  (Id. at 16.)

Dr. Seely's report clearly places the origin of K.G.'s academic problems in the

realm of social maladjustment (specifically, conduct and personality disorders) rather than

emotional disturbance or mood disorder such as depression.  He identifies no other condition that

would justify a classification of emotional disturbance apart from K.G.'s obvious social

maladjustment

          In his IHO hearing testimony, Dr. Seely candidly reiterated the connection

between K.G.'s school difficulties and his defiant conduct: His lower performance in some

educational areas, "although they are not at a level that constitutes a learning disorder, these do

point to him having more frustration and difficulty in school, which has primarily been affected

by his difficulties with authority and his unwillingness to participate in the educational process."

(Tr. at 400-01.)  He also made clear that the contemplated therapy included therapy to deal with

narcissistic personality traits, which "contribute to a lot of his justifications of his behaviors to

his feeling that he was entitled to engage in the behaviors that he had done."  (Id. at 402-03.)

Those feelings, Dr. Seely testified, "contributed a great deal to his conduct disorder in which he

engaged in many illegal activities[,] to him participating in the beating of some kids at which he

was charged by the courts, and his general demeanor with his teachers. . . . He often would

blame his teachers for his problems and then not participate in school and then that non-

participation would contribute to him having difficulties and being able [sic] to perform in the

classroom."  (Id. at 403-04.)

          The IHO hearing testimony of Cross Creek administrators similarly identified

anger and oppositional behaviors upon arrival, and therapies directed to behavior modification.

Joan Jepson, the "family representative," testified that K.G. "was very angry and did not like

himself" upon arrival and that the anger presented learning process issues, but that KD "learned

real fast that we didn't tolerate the anger . . . [s]o he learned fast to do what he needed to do that

he could concentrate and things like that."  (Id. at 112-16.)  Therapist Brian Parker testified that

K.G. presented as "a very angry young man," attributing the affect to irritability symptomatic of clinical depression.  Parker also testified that the depression affected academic performance "in that he was not very motivated to participate in school" and had self-esteem issues.  (Id. at 300.) After about eight months of the Cross Creek program, K.G. did not qualify for a depression diagnosis at all.  (Id. at 300-01.)  In light of the diagnostic and clinical evidence in the written reports of Drs. Seely and Meyers, the Court does not find persuasive Parker's testimony as to the cause of K.G.'s refusal to participate in educational activities.

K.G.'s mother's testimony, too, identified anger in relation to school work as a major problem, stating that, by the fall of 2007 at Madison, K.G. "resented [teachers] and showed resentment to the way they had been treating him." (Id. at 470.)  K.G. was using drugs, did not want to attend school, and had to be taken forcibly to Cross Creek just before a scheduled court appearance in connection with an assault charge.  (Id. at 508-15.)  M.G. attributes the symptomology to depression, but there is no evidence that she is qualified to diagnose the nature of K.G.'s condition.

The record contains only one piece of documentation by a treating professional that reflects a diagnosis of severe major depressive disorder.  Dr. Gurvits's March 21, 2009, letter, which was prepared after the CSE meeting and before the IHO proceeding, represents that K.G. was under her care between October 3, 2007, and March 25, 2008, and presents diagnoses of Major Depressive Disorder 296.33,[18] Generalized Anxiety Disorder, Polysubstance

---

[18]    The digits ".33" indicate recurrent Major Depressive Episodes that are or were "Severe without Psychotic Features." (DSM-IV at 370.)

Dependence,[19] and Antisocial Personality Disorder.  (IHO Hr'g Ex. S-1.)  The letter is

conclusory, fails to relate symptomology to any particular time frame within the treatment

period, and acknowledges that K.G. exhibited signs and effects of conduct as well as substance

abuse and depressive disorders.  It is not persuasive as to the existence of an IDEA-covered

emotional disturbance as the cause of K.G.'s academic difficulties.  Dr. Meyers' generalized use

of the term "emotional disturbance" in his 2009 letter (IHO Hr'g Ex. P-1) is similarly

uninformative and unpersuasive with respect to any emotional etiology of K.G.'s truancy and

oppositional behaviors, particularly when considered in light of the diagnostic and clinical

information presented in Dr. Meyers' March 2008 report.

      The preponderance of the evidence of record, reviewed carefully and taken as a

whole, is thus insufficient to demonstrate that K.G.'s academic problems – which manifested

chiefly as truancy, defiance and refusal to learn – were the product of depression or any similar

emotional condition.  Rather, they were the product of conduct and related disorders, and a

narcissistic personality trait, combined with substance dependence and abuse.  Social

maladjustment, without any independent emotional disturbance, is at the root of the problems

that led to the Cross Creek placement for which Plaintiffs seek reimbursement.

      Furthermore, the record, with one exception, does not support by a preponderance

of the evidence, the presence of the three emotional disturbance criteria relied upon by Plaintiffs.

Plaintiffs, as noted above, seek classification on the basis of New York regulation criteria (ii),

(iii) and (iv).  Criterion (ii), "an inability to build or maintain satisfactory interpersonal

---

[19]    Dr. Gurvits used the term "PSA 304.80."  Diagnostic code 304.80 corresponds to
Polysubstance Dependence which, according to the DSM-IV, is used for behavior
during a 12-month period in which at least 3 groups of substances were used
repeatedly but no single substance predominated.  (DSM-IV at 293.)

relationships with peers and teachers," is belied by the abundant evidence that K.G. maintained friendships (albeit including unsavory ones) before, during and after his Cross Creek placement, and that he reacted well to teachers in whose courses he did well.  Nor is there any indication that his academic problems stemmed from problems with interpersonal relationships.  Criterion (iii), "inappropriate types of behavior or feelings under normal circumstances" is met superficially by the obvious and uncontroverted fact that it was inappropriate for a high-school-aged child to refuse to go to school.  As explained above, however, such inappropriate behavior that is attributable to social maladjustment, rather than to an independent emotional disturbance, is insufficient to warrant recognition and accommodation of an emotional disturbance disability. Criterion (iv), "a generally pervasive mood of unhappiness or depression," is effectively undocumented with respect to the period of K.G.'s placement at Cross Creek and in any event, as explained above, the professional diagnosticians attribute his academic difficulties principally to conduct, behavior and personality disorders, and substance abuse, rather than to the diagnosed depressive condition or any other emotional disorder.

Thus, although the record makes clear that K.G. was a child at risk of academic failure and other harm in March 2008, and that intervention was required to put him on a socially appropriate track of lawful and safe behavior, Plaintiffs have failed to demonstrate by a preponderance of the evidence that K.G. was at any time between March 2008 and the end of the 2008-09 academic year a "child with a disability" for whom special education and related services were required to be provided by the New York City Department of Education.

In light of Plaintiffs' failure to demonstrate that K.G. was entitled to services under the IDEA, it is unnecessary for the Court to review the suitability of the Cross Creek placement.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment denying Plaintiffs' request for reimbursement of the tuition costs incurred in connection with the placement of K.G. at Cross Creek Academy is granted.  Plaintiffs' request for attorneys' fees is denied because they have not prevailed in this action.  This Opinion and Order resolves docket entry nos. 15 and 22.  The Clerk of Court is requested to enter judgment in Defendant's favor and to close this case.


SO ORDERED.


Dated: New York, New York
       May 18, 2011

_____
LAURA TAYLOR SWAIN
United States District Judge